IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TIDERA HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-CV-799-WKW |
| | ) | [WO] |
| THE CITY OF MONTGOMERY, a | ) | |
| municipal corporation, and | ) | |
| GREGORY HARVEY, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On October 17, 2021, Montgomery Police Officers Gregory Harvey and Rene Helton were dispatched to the home of Chimeka Minefield—Tidera Harris's fiancé. Per dispatch, Officer Harvey was informed that a domestic violence incident was happening at Ms. Minefield's home, that Mr. Harris was there, and that there potentially were warrants out for Mr. Harris's arrest.

Once there, Officer Harvey repeatedly asked Mr. Harris to step outside so that he could ask him some questions about what was going on. Instead of following Officer Harvey's request, Mr. Harris walked through the house twice, stooping down and rummaging through different belongings. Finally, Mr. Harris complied with Officer Harvey's request and stepped outside.

Once outside, Mr. Harris told Officer Harvey that there had been a misunderstanding between him and Ms. Minefield about his housing situation but that no physical violence had occurred.  After giving Officer Harvey his name and birthdate, Mr. Harris lifted his cellphone to his ear and took a call.  He then started walking toward his Dodge Charger, which was parked in the driveway.  As he rounded the back of the car, he ran toward the driver's side door.  In these few seconds, Officer Harvey yelled "Hey, hey, no.  Hey, dawg."[1]  Mr. Harris opened the driver's side door and began to sit down in the driver's seat.  And at that moment Officer Harvey shot three times, hitting Mr. Harris once in the back and once in the shoulder.

Mr. Harris sued Officer Harvey and the City of Montgomery claiming (1) that Officer Harvey committed an unlawful assault and battery under state law, (2) that Officer Harvey violated his Fourth Amendment rights, under 42 U.S.C. § 1983, to be free from excessive force, (3) that the City of Montgomery was liable under *Monell*,[2] and (4) that Officer Harvey was negligent and/or wanton under state law.  Defendants moved for summary judgment (Doc. # 52); Plaintiff responded (Doc. #

---

[1] "Dawg" is a slang term for "man, buddy, [or] dude" which is "used especially as a familiar form of address."  Merriam-Webster, *Dawg*, https://www.merriamwebster.com/dictionary/dawg (last visited May 10, 2023).  The following is an example of the term's usage: "What's up, dawg?"  Cambridge Dictionary, *Dawg*, https://dictionary.cambridge.org/us/dictionary/english/dawg (last visited May 10, 2023).

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

61); and Defendants replied (Doc. # 66).   For the reasons discussed below, Defendants' motion for summary judgment will be granted in part and denied in part.

## I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.  Personal jurisdiction and venue are uncontested.[3]

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material

---

[3] Plaintiff's Amended Complaint alleges that venue is proper in the Montgomery County Circuit Court (Doc. # 32 at 3), but this appears to be a typographical error—perhaps a failure to edit the original complaint filed in state court—since, as Defendants rightly state (Doc. # 33 at 2), the case was properly removed from the Montgomery County Circuit Court to this court (Doc. # 1).

fact.  *Id.*  Alternatively, a movant without a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex Corp.*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.  BACKGROUND

On October 17, 2021, Officer Gregory Harvey was dispatched to 417 Glade Park Drive, Montgomery, Alabama, on a domestic violence call.  (Doc. # 62-1 at 7–

8, 10; Doc. # 54-7 at 3.)[4]  Officer Rene Helton accompanied Officer Harvey on the call.  "Domestic violence . . . calls are some of the most dangerous calls for a police officer."  (Doc. # 54-7 at 2.)  Per dispatch, Officer Harvey was informed that Tidera Harris was at the house and that there were possibly warrants out for his arrest.  (Doc. # 62-1 at 9; Doc. # 62-2 at 26; Doc. # 54-7 at 3.)[5]  Officer Harvey was concerned that "[t]here could be a physical altercation," and his goal was to "[d]iffuse the situation."  (Doc. # 54-3 at 12–13.)  As the officers approached the residence, Officer Harvey "could hear a verbal altercation."  (Doc. # 54-3 at 16.)  Officer Harvey opened the porch door and then the door to the house without knocking.  (Doc. # 54-5 at 00:50–00:58.)

Officer Harvey says he entered the house without knocking because he thought he "need[ed] to step in and intervene before things g[o]t worse."  (Doc. # 54-3 at 16.)  And he was concerned that, if he had knocked, "it would [have] allow[ed] one of the subjects to grab a gun or to run or to do anything to make the scene unsafe."  (Doc. # 54-3 at 16.)  Officer Harvey announced that he was with the Montgomery Police Department.  (Doc. # 54-3 at 15; Doc. # 54-5 at 00:59–01:00.)

---

[4] The entire incident is captured on the body camera footage (audio and video) from Officer Harvey and Officer Helton.  All non-video citations use the pagination as designated by the CM/ECF filing system.  The body camera footage is cited according to the time elapsed in the recordings.

[5] There is tension in the record over whether there were, in fact, warrants out for Mr. Harris's arrest.  (Doc. # 62-1 at 9 (saying there were); Doc. # 62-2 at 26 (saying there were or there "possibly" were); Doc. # 54-7 at 3 (saying there possibly were).)

Once inside the front door, Chimeka Minefield, Tidera Harris's fiancé, stepped to the front of the house, invited Officers Harvey and Helton in, told them that "he [referring to Mr. Harris] taken all my stuff and throwing it in there. Y'all need to get him. . . . Y'all need to get him." (Doc. # 54-3 at 1:04–1:09; Doc. # 64-1 at 2; Doc. # 54-7 at 3.) Officer Harvey asked Ms. Minefield if there were "any weapons inside the house," and she said there were not. (Doc. # 54-3 at 1:12–1:14; Doc. # 64-1 at 2.)

Mr. Harris stepped to the door and said, "I move my stuff; I move my stuff, man. I move my stuff. I'm gonna leave. We're moving it back to the front where my landlord told me." (Doc. # 54-5 at 01:15–01:21; Doc. # 64-1 at 3.) Ms. Minefield interrupted and said, "He got warrants for his arrest," which Mr. Harris denied. (Doc. # 54-5 at 01:21–01:22; Doc. # 64-1 at 3; Doc. # 54-7 at 3.) Officer Harvey asked if Mr. Harris had his I.D., and Officer Helton also asked if Ms. Minefield and Mr. Harris had their I.D.s. (Doc. # 54-5 at 01:23–01:25; Doc. # 64-1 at 3.) Mr. Harris initially said he had his I.D., but when Officer Harvey asked to see it, Mr. Harris said, "I don't have my I.D. on me." (Doc. # 54-5 at 01:25–01:27; # 64-1 at 3–4.) Ms. Minefield said, "I don't even know where it is. My stuff throwed around. . . . I don't even know where it is." (Doc. # 54-5 at 01:27–01:31; Doc. # 64-1 at 4.) Mr. Harris interrupted Ms. Minefield and said, "No, I moved my stuff where the landlord told me." (Doc. # 54-5 at 01:30; Doc. # 64-1 at 4.)

Mr. Harris then waived his hand toward the door and said, "I'm fixing to come outside on the porch to talk with y'all.  I'll be calling my landlord."  (Doc. # 54-5 at 01:32–01:34; Doc. # 64-1 at 4.)  Both Officers asked Ms. Minefield and Mr. Harris to step outside.  (Doc. # 54-5 at 01:35–01:38; Doc. # 64-1 at 4.)  Ms. Minefield stepped out on the porch.  (Doc. # 54-5 at 01:38–01:39; Doc. # 54-7 at 3.)  Mr. Harris said, "All right.  I'm looking for my I.D."  (Doc. # 54-5 at 01:39–01:41; Doc. # 64-1 at 4.)  Officer Harvey said, "No, no, don't worry about it, dawg.  You've [got] to leave.  Move out."  (Doc. # 54-5 at 01:41-01:44; Doc. # 64-1 at 4.)

At that point, Mr. Harris walked through the dining room, through the kitchen, and around to the living room.  (Doc. # 54-5 at 01:41–01:51.)  The living room was dark, and Mr. Harris bent down to pick something up which made a rattling sound (like keys).  (Doc. # 54-5 at 01:50–01:52.)  Officer Harvey turned his flashlight on to observe what Mr. Harris was doing.  (Doc. # 54-5 at 01:53–01:55; Doc. # 54-3 at 21.)

Officer Helton entered the living room and said to Mr. Harris, "Hey, sir, we just need you to step outside because we don't know if you have got weapons inside the house or whatnot."  (Doc. # 54-5 at 01:56–02:01; Doc. # 64-1 at 5.)  Mr. Harris responded, "I got a weapon."  (Doc. # 54-5 at 02:01; Doc. # 64-1 at 5.)  Officer Helton responded, "Okay.  So we're going to ask you to step outside."  (Doc. # 54-5 at 02:02–02:03; Doc. # 64-1 at 5.)  Mr. Harris followed Officer Helton through the

living room, placing his cellphone in the right pocket of his shorts, and walked toward the front door.  (Doc. # 54-5 at 02:04–02:13.)

Just before he reached the front door, his cellphone started to ring.  (Doc. # 54-5 at 02:11–02:14.)  He turned back from the door, mumbling "I need shoes, man," and Officer Harvey said, "Just step out on the porch for me, dawg."  (Doc. # 54-5 at 02:13–02:15; Doc. # 64-1 at 5.)  On the right side of the door, Mr. Harris bent down and started to rummage through shoes and flip flops.  (Doc. # 54-5 at 02:15–02:23.)  Officer Harvey patted him on the shoulder, gave him a light push, and said, "Hey, don't worry about shoes, man.  Just step—just step out on the porch.  You can go on outside."  (Doc. # 54-5 at 02:23–02:24; Doc. # 64-1 at 5.)  Mr. Harris dropped a flip flop and asked, "Where?"  (Doc. # 54-5 at 02:24–02:25.)  Officer Harvey said, "Just step out on the porch for me, on the front porch."  (Doc. # 54-5 at 02:25–02:27; Doc. # 64-1 at 5.)

Mr. Harris turned back from the front door, said "I want to get my keys," and Officer Harvey said, "Okay.  I gotcha."  (Doc. # 54-5 at 02:29–02:31; Doc. # 64-1 at 6.)  Mr. Harris then walked through the dining room, the kitchen, and around into the living room where he bent down at the same location he was previously.  (Doc. # 54-5 at 02:31–02:37.)  As Mr. Harris was walking through the house again, Officer Harvey said, "Hey, man, hey, hey, come here, man.  Hey dawg, you got to step out there and stop moving man."  (Doc. # 54-5 at 02:32–02:37; Doc. # 64-1 at 6.)  In

response, Mr. Harris said, "I be coming out right now." (Doc. # 54-5 at 02:38; Doc. # 64-1 at 6.) Mr. Harris then walked through the living room, through the front door, and onto the porch. (Doc. # 54-5 at 02:38–02:47.) He had his cellphone in his right hand. (Doc. # 54-5 at 02:38–02:40.)

As he walked onto the porch, he lifted his cellphone to his ear and said, "Hello." (Doc. # 54-5 at 02:44–02:48; Doc. # 64-1 at 6.) Officer Helton was standing at the porch screen door and said, "He [Officer Harvey] is going to talk to you in here." (Doc. # 54-5 at 02:50–02:51; Doc. # 64-1 at 6.) Officer Harvey responded, "Yeah. We going outside." (Doc. # 54-5 at 02:52–02:53; Doc. # 64-1 at 6.) Officer Helton told Officer Harvey, "He [Mr. Harris] got his car keys." (Doc. # 54-5 at 02:53–02:54; Doc. # 64-1 at 6.) Mr. Harris said, "I opened the car from here, man." (Doc. # 54-5 at 02:56; Doc. # 64-1 at 6.) Officer Harvey responded to Officer Helton, "Okay. He good." (Doc. # 54-5 at 02:57–02:58; Doc. # 64-1 at 6.) Mr. Harris and Officer Harvey walked out the screen door and onto the front yard. (Doc. # 54-5 at 02:59–03:01.)

Once in the front yard, Officer Harvey asked Mr. Harris, "What going on, man?" (Doc. # 54-5 at 03:02; Doc. # 64-1 at 6.) Mr. Harris responded by saying the following:

> Man, we have a misunderstanding. I am going to leave. She told me to move my stuff. The landlord told me to move all my stuff. That's what I am doing. I put my stuff in the front. I woke up, a misunderstanding. I moved my stuff in the front; that was it.

9

(Doc. # 54-5 at 03:03–03:18; Doc. # 64-1 at 7.)  Officer Harvey then said, "Okay. So, y'all didn't get into no—nothing?" (Doc. # 54-5 at 03:19–03:20; Doc. # 64-1 at 7.)  Mr. Harris responded, "No.  No.  Nothing physical." (Doc. # 54-5 at 03:20–03:21; Doc. # 64-1 at 7.)  Mr. Harris then looked toward his blue Dodge Charger parked in the driveway.  (Doc. # 54-5 at 03:23–03:26.)  He then looked down at his phone in his right hand.  (Doc. # 54-5 at 03:27.)  After this, Officer Harvey asked Mr. Harris his name and date of birth, which Mr. Harris provided.  (Doc. # 54-5 at 03:28–03:47; Doc. # 64-1 at 7–8.)

After giving Officer Harvey his date of birth, Mr. Harris turned his back on Officer Harvey, lifted his cellphone to his ear, said "Hello," and started walking toward his Charger.  (Doc. # 54-5 at 03:47–03:50; Doc. # 64-1 at 8.)  As Mr. Harris passed the bumper of the Charger, Officer Harvey said, "Hey, hey, no.  Hey, dawg." (Doc. # 54-5 at 03:49–03:51; Doc. # 64-1 at 8.)  Mr. Harris rounded the driver's side of the Charger and ran for the driver's side door.  (Doc. # 54-5 at 03:51–03:53; Doc. # 54-6 at 02:40.)  Officer Harvey ran after him.  (Doc. # 54-5 at 03:50–03:53; Doc. # 54-6 at 02:39–02:40.)

As Mr. Harris opened the driver's side door and got into the car, with his back toward Officer Harvey, Officer Harvey fired one shot, said "Hey, hey," and then, a split-second later, fired two shots.  (Doc. # 54-5 at 03:52–03:54; Doc. # 64-1 at 8.)  Mr. Harris exclaimed, "Man, I ain't got no gun, man.  I ain't got no gun.  I got my

keys." (Doc. # 54-5 at 03:58–04:01; Doc. # 64-1 at 8.) Two of Officer Harvey's three shots hit Mr. Harris—one in the right shoulder and one in the back. (Doc. # 54-5 at 04:41–03:57; Doc. # 64-1 at 9–10.)[6] After the incident, no firearm was found in Mr. Harris's Charger (Doc. # 62-1 at 23; Doc. # 62-2 at 20), and there is no evidence that Mr. Harris had a firearm on his person.

## IV.  DISCUSSION

Mr. Harris brings four claims against Defendants. (Doc. # 32 at 9–17.) In Count I, Mr. Harris asserts that Officer Harvey committed assault and battery under Alabama law against him. In Count II, Mr. Harris asserts, under 42 U.S.C. § 1983, that Officer Harvey used excessive force against him in violation of the Fourth Amendment. In Count III, Mr. Harris asserts that the City of Montgomery is liable under *Monell*. In Count IV, Mr. Harris asserts that Officer Harvey was negligent and/or wanton under Alabama law. Defendants have moved for summary judgment on each claim. (Doc. # 52.) In Part A, the court will analyze Mr. Harris's § 1983 claim against Officer Harvey. In Part B, the court will analyze Mr. Harris's state law claims against Officer Harvey. In Part C, the court will analyze Mr. Harris's *Monell* claim against the City of Montgomery.

---

[6] Several of Mr. Harris's and Ms. Minefield's children were in the house during this interaction. (Doc. # 54-3 at 17.)

A.     **42 U.S.C. § 1983 Excessive Force Claim**

Defendants argue that summary judgment should be granted on Mr. Harris's § 1983 excessive force claim (Count II) for two reasons.  First, Defendants argue that Officer Harvey's use of force against Mr. Harris was objectively reasonable under the circumstances.  (Doc. # 53 at 18–22; Doc. # 66 at 4–18.)  Second, Defendants argue that Officer Harvey is entitled to qualified immunity.  (Doc. # 53 at 22–25; Doc. # 66 at 4–18.)

**1.   *Objectively Reasonable Force Under the Circumstances***

"*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" are "analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").[7]  To "determine[e] the reasonableness of the force applied," the court "look[s] at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the

---

[7] "[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied."  *Scott v. Harris*, 550 U.S. 372, 381 (2007) (alterations in original) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596–597 (1989)).  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting *Graham*, 490 U.S. at 396).

risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013).[8]

But what does "reasonableness" mean?  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  Ordinarily, "[t]he reasonableness of the force used can depend on a number of factors."  *Cantu v. City of Dothan*, 974 F.3d 1217, 1229 (11th Cir. 2020).[9]  Under this multi-factored inquiry, the court would have to "'slosh [its] way through the factbound morass of' the 'reasonableness' analysis." *Harris-Billups ex rel. Harris v. Anderson*, 61 F.4th 1298, 1302 (11th Cir. 2023) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)).

But where deadly force has been used "a bright(ish) line emerges: '[A]n officer may use deadly force when [he] has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"  *Id.* (first

---

[8] Since there were potentially warrants out for Mr. Harris's arrest, this incident could be viewed as an arrest.  But Officer Harvey never told Mr. Harris that he was under arrest or attempted to take him into custody.  (Doc. # 54-3 at 18.)  Rather, he sought to investigate the domestic violence situation, which would be akin to an investigatory stop.  (*See* Doc. # 54-3 at 18.)  The court does not decide what type of interaction this was because, in either case, the same Fourth Amendment standard applies.

[9] For example, the Supreme Court has directed lower courts to "consider 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight.'" *Cantu*, 974 F.3d at 1229 (alterations in original) (quoting *Graham*, 490 U.S. at 396).  The Eleventh Circuit has directed district courts to also consider "the need for force to be applied," "the amount of force applied in light of the nature of the need," and "the severity of the injury."  *Patel v. City of Madison*, 959 F.3d 1330, 1339 (11th Cir. 2020); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (providing a different articulation of six factors).

alteration in original) (quoting *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir.), *cert. denied*, 143 S. Ct. 110 (2022)).[10]  "Probable cause, in turn, exists when the 'facts and circumstances [are] sufficient to warrant a prudent' officer in reaching that conclusion." *Id.* (alteration in original) (quoting *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016)).[11]  "And to be clear, the inquiry is an objective one." *Id.* "[T]he question is whether the officer['s]  actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham*, 490 U.S. at 397.  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*  The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often

---

[10] Deadly force is "force that an officer 'knows to create a substantial risk of causing death or serious bodily harm.'" *Bradley v. Benton*, 10 F.4th 1232, 1241 (11th Cir. 2021) (quoting *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1479 n.10 (11th Cir. 1985)), *cert. denied*, 142 S. Ct. 1112 (2022).  Shooting someone with a pistol creates a substantial risk of causing death or serious bodily harm and, thus, is deadly force.  And Officer Harvey knew that shooting Mr. Harris created such risks.  (*See* Doc. # 62-1 at 26; Doc. # 62-2 at 14–15.)  Unfortunately for all involved, especially Mr. Harris, this particular use of deadly force resulted in very serious injury.

[11] "'Probable cause,' the Supreme Court has emphasized, 'is not a high bar.'"  *Harris-Billups*, 61 F.4th at 1302 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Wesby*, 138 S. Ct. at 586 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44, n.13 (1983)).

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The facts, viewed in the light most favorable to Mr. Harris, *Cantu*, 974 F.3d at 1228, demonstrate that he did not pose "a threat of serious physical harm" to Officer Harvey, Officer Helton, Ms. Minefield, or the children at any point during the incident. *Harris-Billups*, 61 F.4th at 1302 (quoting *Powell*, 25 F.4th at 922).

Before entering the house, Officer Harvey did not possess information that Mr. Harris posed "a threat of serious physical harm." *Id.* Officer Harvey believed that he was entering a potentially volatile domestic violence situation. (*See* Doc. # 54-3 at 12–13.) But that general knowledge did not inform Officer Harvey about the threat Mr. Harris posed. In addition, Officer Harvey did not have any information about Mr. Harris's criminal record beyond that Mr. Harris "had warrants, or possibly had warrants" out for his arrest. (Doc. # 62-2 at 26; *see also* Doc. # 54-7 at 3.) Such generic knowledge could not serve as a basis for believing that Mr. Harris posed a threat of serious harm.

While he was in the house, Mr. Harris did not pose any threat to anyone. Officer Harvey says that there was not an "imminent threat." (*See* Doc. # 62-1 at 13.) Mr. Harris did not exhibit any threatening behavior toward either of the officers. And he did not say anything threatening to either of them. (Doc. # 54-3 at 22.)

Rather, he was a man having a disagreement with his fiancé about his housing situation.  (Doc. # 54-5 at 01:15–01:21; Doc. # 64-1 at 3.)  And he gave reasons why he did not exit the house right away.  First, he was looking for his I.D.  (Doc. # 54-5 at 01:39–01:41; Doc. # 64-1 at 4.)  Second, he wanted to put shoes on before going outside.  (Doc. # 54-5 at 02:13–02:23; Doc. # 64-1 at 5.)  Third, he wanted to get his car keys.  (Doc. # 54-5 at 02:29–02:31; Doc. # 64-1 at 6.)  Offhandedly, Mr. Harris did tell Officer Helton that "I got a weapon."  (Doc. # 54-5 at 02:01; Doc. # 64-1 at 5.)  But, in contrast, Ms. Minefield told Officer Harvey that there were no weapons in the house. (Doc. # 54-3 at 1:12–1:14; Doc. # 64-1 at 2.)  There is no indication in the body camera footage, apart from this stray comment, that Mr. Harris was armed.  And Officer Harvey allowed Mr. Harris to get his keys and take them outside. (Doc. # 54-5 at 02:29–02:37, 02:53–02:54, 02:57–02:58; Doc. # 64-1 at 6.)

Once outside, Mr. Harris also did not pose a threat of serious harm.  He cooperatively told Officer Harvey what was going on and gave him his name and date of birth.  (Doc. # 54-5 at 03:03–03:18, 03:28–03:47; Doc. # 64-1 at 7–8.)  Mr. Harris never pulled a firearm on Officer Harvey.  (Doc. # 62-1 at 15.)  During this interaction, Ms. Minefield was on the porch with Officer Helton (Doc. # 54-6 at 01:53–02:36), and the children were in the house (*see* Doc. # 54-3 at 17).  As Mr. Harris was opening the driver's side door and sitting down, Officer Harvey shot him twice—in the back and in the shoulder.  (Doc. # 54-5 at 03:52–03:54; Doc. # 64-1

at 8.)  After being shot, Mr. Harris exclaimed that he did not have a gun (Doc. # 54-5 at 03:58–04:01; Doc. # 64-1 at 8).  After the incident, no firearm was found in Mr. Harris's Charger (Doc. # 62-1 at 23; Doc. # 62-2 at 20), and there is no evidence in the record that Mr. Harris had a firearm on his person.

Officer Harvey has a different perspective on what happened.  While in the house, "[d]ue to the way [Mr. Harris] was rummaging through things," Officer Harvey thought "maybe he was looking for a weapon."  (Doc. # 54-3 at 23; *see also* Doc. # 62-1 at 13 ("He did things in the house that day that made me raise alarm[.]").)[12]  And once outside, Officer Harvey says that he "had a reasonable suspicion that there was a weapon inside the car."  (Doc. # 54-3 at 42.)  Officer Harvey says his reasonable suspicion was based on Mr. Harris disobeying orders, "rummaging through the house after being told not to," "passively resisting," and "bolting to the car" after Officer Harvey told him "No."  (Doc. # 54-3 at 35, 43.)  Moreover, Officer Harvey says that "[a]t the time [he] shot, Mr. Harris was an immediate threat because [Officer Harvey] did not know what was inside the car."  (Doc. # 54-4 at 17.)

But the question is not whether Officer Harvey "actually believed that the circumstances justified the use of deadly force, but rather whether a reasonable officer in [his] position could have so concluded."  *Harris-Billups*, 61 F.4th at 1302

---

[12] Officer Helton thought the same thing.  (Doc. # 54-7 at 4 ("I did not know if Tidera Harris had weapons, or if what he was searching for and/or reaching for was a weapon.").)

(citing *Graham*, 490 U.S. at 397); *Penley v. Eslinger*, 605 F.3d 843, 852 (11th Cir. 2010) (noting that the relevant inquiry is whether a reasonable officer in the same situation would have "believed that" the suspect was "gravely dangerous").  Viewing the facts in the light most favorable to Mr. Harris, *Cantu*, 974 F.3d at 1228, the court finds that a reasonable jury could find that Officer Harvey did not have probable cause to use deadly force against Mr. Harris.  Determining the reasonableness of Officer Harvey's use of deadly force is left for trial.

## 2.  *Qualified Immunity*

Defendants also assert that, based on qualified immunity, summary judgment should be granted on Mr. Harris's § 1983 claim against Officer Harvey.  "The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

"To be protected by the doctrine of qualified immunity, a government official must first establish that [he] was acting within the scope of [his] discretionary authority."  *Cantu*, 974 F.3d at 1228.  "[D]iscretionary authority . . . include[s] all

actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) (second alteration in original) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)). There is no dispute that Officer Harvey was acting within the scope of his discretionary authority on October 17th. Once an officer establishes that he acted within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Powell*, 25 F.4th at 920 (quoting *Penley*, 605 F.3d at 849).

"To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so." *Id.* "'[T]he salient question . . . is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendant[] 'that [his] . . . conduct was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (first alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Since the question of whether Officer Harvey violated Mr. Harris's Fourth Amendment right to be free from excessive force is for the jury, the only question remaining is whether that right was clearly established when Officer Harvey shot Mr. Harris.

"[T]he clearly established law standard is a demanding one." *Cantu*, 974 F.3d at 1235.  Mr. Harris can satisfy the standard in one of the following three ways:

> (1) by pointing to a materially similar decision of the Supreme Court, of [the Eleventh Circuit], or of the [Supreme Court of Alabama]; (2) by establishing that "a broader, clearly established principle should control the novel facts" of the case; or (3) by convincing [the court] that the case is one of those rare ones that "fits within the exception of conduct which so obviously violates th[e] [C]onstitution that prior case law is unnecessary."

*Powell*, 25 F.4th at 920 (fourth alteration in original) (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).[13]

As to the first method, the Eleventh Circuit does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)), *cert. denied*, 142 S. Ct. 1112 (2022).  As to the second method, "[t]o control a novel factual situation, a broad principle 'must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct . . . violate[d] federal law when the official acted.'" *Id.* (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)).  And the

---

[13] Although the Eleventh Circuit has "recognized that options two and three can suffice, the Supreme Court has warned [courts] not to 'define clearly established law at a high level of generality.'"  *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  "For that reason, the second and third paths are rarely-trod ones." *Id.*

broad principle "must 'appl[y] with *obvious clarity* to the circumstances.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007)).

Mr. Harris has not produced a case that meets the requirements of the first method for showing that the relevant right was clearly established—a case involving an investigatory stop where the suspect is unarmed, does not act violently, flees toward his car, and then is shot twice from behind.[14]  And the court is not aware of any other case decided by the Supreme Court, by the Eleventh Circuit, or by the Alabama Supreme Court that is "materially similar" to this case.  *Powell*, 25 F.4th at 920.

But Mr. Harris has pointed "to a broader, clearly established principle [that] should control the novel facts in [his] situation."  *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015) (alterations in original) (quoting *Morton*, 707 F.3d at 1282); (*see* Doc. # 61 at 8.)  That "clearly established" principle is the following: "Using deadly force, without warning, on an unarmed, retreating suspect is excessive."  *Salvato*, 790 F.3d at 1294; *Hunter v. City of Leeds*, 941 F.3d 1265, 1281 (11th Cir. 2019) (quoting *Salvato*, 790 F.3d at 1294).  According to the Eleventh Circuit, its "precedents and those of the Supreme Court make clear that firing without first

---

[14] The court does not analogize from the cases that Mr. Harris provides (Doc. # 61 at 21) because those cases do not put the "question beyond debate."  *Bradley*, 10 F.4th at 1242 (quoting *Ashcroft*, 563 U.S. at 741).

warning on a retreating, apparently unarmed suspect is excessive." *Salvato*, 790 F.3d at 1294; *see Garner*, 471 U.S. at 1 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); *see also Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir. 2016) ("[T]he Supreme Court has ruled it unreasonable to shoot an unarmed person who is escaping, even when the person has committed a felony."). As a result, Officer Harvey had "fair warning" that his use of force against Mr. Harris was excessive. *Salvato*, 790 F.3d at 1294 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004)). In other words, this principle is obviously clear. *Bradley*, 10 F.4th at 1242.[15]

And the principle clearly applies to the facts of this case. *Crocker*, 995 F.3d at 1240. First, by shooting Mr. Harris twice, Officer Harvey used deadly force against him. *Bradley*, 10 F.4th at 1241 (defining deadly force). Second, Officer Harvey did not give Mr. Harris a warning before shooting at him. Saying "Hey, hey, no. Hey, dawg" before shooting was not a warning to Mr. Harris that Officer Harvey was about to shoot. (Doc. # 54-5 at 03:49–03:51; Doc. # 64-1 at 8.) Third, as already discussed, there is no indication that Mr. Harris was armed when he was shot. Rather, Officer Harvey was concerned that Mr. Harris *may* have had a weapon in his

---

[15] Other district courts in this Circuit have found that this principle is clearly established. *Kinsey v. Aledda*, No. 16-CV-23330-JAL, 2018 WL 11352486, at *9 (S.D. Fla. Feb. 28, 2018); *Horton v. Morgan Cnty. Sheriff's Dep't*, No. 5:16-CV-923-CLS, 2016 WL 6576986, at *8 (N.D. Ala. Nov. 7, 2016); *Chruma v. Bosarge*, No. 15-CV-132-WS, 2016 WL 3199526, at *8 (S.D. Ala. June 8, 2016).

Charger.  (Doc. # 54-4 at 17.)  Fourth, Mr. Harris was walking (and then running) away from Officer Harvey toward his Charger (*i.e.*, he was retreating) and had his back turned toward Officer Harvey when Officer Harvey shot.  (Doc. # 54-5 at 03:48–03:55; Doc. # 54-6 at 02:39–02:41.)  Viewing the facts in the light most favorable to Mr. Harris, *Cantu*, 974 F.3d at 1228, the court finds that the right Officer Harvey may have violated was clearly established at the time of the shooting.  For these reasons, Officer Harvey's qualified immunity defense will be denied.

Because Defendants' arguments that Officer Harvey's use of force was reasonable and that he is entitled to qualified immunity fail, their motion for summary judgment is due to be denied as to Mr. Harris's § 1983 claim (Count II).

## B.  **State Law Claims**

Defendants argue that summary judgment should be granted on Mr. Harris's state law claims of assault and battery (Count I) and negligence and/or wantonness (Count IV).  (Doc. # 53 at 29–34.)  "To establish negligence" under Alabama law, a "plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury."  *Hilyer v. Fortier*, 227 So. 3d 13, 22 (Ala. 2017) (quoting *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015)).  "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty.  To be actionable, that act or omission must

proximately cause the injury of which the plaintiff complains." *Id.* (quoting *Lemley*, 178 So. 3d at 841–42).  Under Alabama law, an assault is:

> an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.

*Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (quoting *Holcombe v. Whitaker*, 294 Ala. 430, 435 (1975)).  And under Alabama law, to establish a claim of battery, "a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998).

Defendants argue that Mr. Harris's state law claims fail because he cannot establish these required elements.  (Doc. # 53 at 30–31.)  In his response, Mr. Harris states that "[e]ach of these state law claims . . . are well documented and supported by the facts and evidence . . . documenting [his] Fourth Amendment claim."  (Doc. # 61 at 28.)  Specifically, Officer Harvey's "use of excessive force . . . illustrate[s] not only [his] Fourth Amendment violation, but also his negligent and wanton assault and battery of [Mr.] Harris."  (Doc. # 61 at 29.)  Viewing the facts in the light most favorable to Mr. Harris, *Cantu*, 974 F.3d at 1228, the court finds that a reasonable jury could find that Officer Harvey's use of deadly force against Mr.

Harris satisfied the elements of one (or more) of these torts—assault, battery, negligence, or wantonness—under Alabama law.

Defendants also argue that summary judgment should be granted because Officer Harvey is entitled to state-agent immunity.  (Doc. # 53 at 31–34; Doc. # 66 at 22–24.)  Alabama law provides that "[e]very peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."  Ala. Code § 6-5-338(a).  The Alabama Supreme Court's decision in *Ex Parte Cranman*, 792 So. 2d 392 (Ala. 2000) governs this grant of state-agent immunity.  *Ex Parte City of Midfield*, 161 So. 3d 1158, 1163 (Ala. 2014).  In that case, the Alabama Supreme Court said the following:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to law-enforcement officers' arresting or attempting to arrest persons[.] . . . Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Cranman*, 792 So.2d at 405.

"The Alabama Supreme Court has largely equated qualified immunity with discretionary-function immunity." *Hunter*, 941 F.3d at 1284. "That means the same facts that establish an officer is not entitled to qualified immunity 'also establish that [he] is not entitled to' state agent immunity." *Cantu*, 974 F.3d at 1236 (quoting *Hunter*, 941 F.3d at 1284). "Under both Alabama law and federal law, the core issue is whether a defendant violated clearly established law." *Sheth v. Webster*, 145 F.3d 1231, 1239 (11th Cir. 1998). For the same reasons Officer Harvey's qualified immunity defense fails on Mr. Harris's § 1983 claim, the court will also deny Officer Harvey's "discretionary-function immunity" defense for Mr. Harris's state law tort claims. *See Hunter*, 941 F.3d at 1284 (doing the same); *Cantu*, 974 F.3d at 1236 (same).

Defendants' motion for summary judgment is due to be denied as to Mr. Harris's state law claims (Count I and Count IV).

## C. *Monell* Claim

Finally, Defendants argue that summary judgment should be granted on Mr. Harris's *Monell* claim against the City of Montgomery (Count III). (Doc. # 53 at 25–28; Doc. # 66 at 18–22.) "Under *Monell*, 'a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue.'" *Baxter v. Roberts*, 54 F.4th 1241, 1269–70 (11th Cir. 2022) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "*Respondeat superior* or vicarious

26

liability will not attach under § 1983." *City of Canton*, 489 U.S. at 385. "To impose *Monell* liability, 'a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation.'" *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir. 2021) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

Assuming for the sake of argument that Mr. Harris's constitutional rights were violated, his *Monell* claim against the City of Montgomery fails at the second step of the analysis. Mr. Harris has produced no evidence that the City of Montgomery "had a custom or policy that constituted deliberate indifference" to the right that Officer Harvey may have violated—the right to be free from excessive force under the Fourth Amendment. *McDowell*, 392 F.3d at 1289. "A plaintiff can establish the existence of a municipal policy or custom in several ways." *Baxter*, 54 F.4th at 1270. These include the following:

> (1) pointing to an official policy; (2) identifying "a widespread practice that, although not authorized by written or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law"; or (3) demonstrating that the municipality "tacitly authorize[d]" or "display[d] deliberate indifference towards" the "constitutionally offensive actions of its employees."

*Id.* (alterations in original) (quoting *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001)). Mr. Harris has not established that the City of Montgomery had a policy or custom in any of these ways.

27

"Ultimately, the plaintiff must show that the municipality's 'policies [were] the moving force behind the constitutional violation.'"  *Id.* (alteration in original) (quoting *City of Canton*, 489 U.S. at 379).  There is no evidence in the record that the City of Montgomery's policies were the moving force behind Officer Harvey's decision to shoot Mr. Harris on October 17, 2021.  Viewing the facts in the light most favorable to Mr. Harris, *Cantu*, 974 F.3d at 1228, there is no genuine dispute of material fact as to his *Monell* claim.  For these reasons, Defendants' motion for summary judgment is due to be granted as to Mr. Harris's *Monell* claim against the City of Montgomery (Count III).

## V.  CONCLUSION

For the reasons provided, it is ORDERED that Defendants' motion for summary judgment (Doc. # 52) is GRANTED in part and DENIED in part.  It is GRANTED as to Count III, and it is DENIED as to all other counts.  Counts I, II, and IV proceed to trial.

DONE this 24th day of May, 2023.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE
